ATLANTA COLLEGE OF MEDICAL
AND DENTAL CAREERS, INC.,
et al., Plaintiffs,

v.

Lamar ALEXANDER, Secretary
of Education, in his official
capacity, Defendant.

Civ. A. No. 92–0200–LFO.

United States District Court,
District of Columbia.

May 7, 1992.

Jonathan B. Hill, Michael B. Goldstein,
Blain B. Butler, Dow, Lohnes & Albertson,
Washington, D.C., for plaintiffs.

Robert Shapiro, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs, Atlanta College of Medical and Dental Careers, Inc. (Atlanta College) and Louisville College of Medical and Dental Careers, Inc. (Louisville College), have participated for more than eight years in the Guaranteed Student Loan (student loan) programs authorized by Title IV of the Higher Education Act (HEA) of 1965, 20 U.S.C. § 1070 *et seq.* Pursuant to § 435(a)(3) of the Higher Education Act, as amended, 20 U.S.C. § 1085(a)(3), the defendant, Lamar Alexander, Secretary of Education in his official capacity, has ruled that plaintiffs are ineligible to participate in those programs as of January 3, 1992. Plaintiffs sue here for a declaratory judgment that the regulations implementing the relevant statutes are unlawful and that the January 3 determination was arbitrary and capricious in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706. Defendant has moved to dismiss or, in the alternative, for summary judgment.

Plaintiffs have demonstrated that the defendant's conduct is arbitrary and capricious for two reasons. First, the defendant failed to articulate a rational basis for the determinations contemporaneous with the decisions or to present these decisions in a reviewable format. Second, the defendant refused to consider material portions of plaintiffs' appeals because they did not contain information to which plaintiffs did not have access. Accordingly, the accompanying Order vacates the Secretary's January 3, 1992 decision and remands this case to the defendant for further consideration and action consistent with this opinion.

I

The student loan programs are authorized by Title IV of the HEA, 20 U.S.C. § 1070, *et seq.* Under these programs, a student receives a loan from a participating lender such as a bank, savings and loan or credit union to pay the costs of education at an eligible postsecondary institution. *See* 20 U.S.C. § 1071 *et seq.;* 34 C.F.R. § 682.100. Repayment of the loan is insured by a State or private non-profit institution, which is called a "guarantee agency." *See* 20 U.S.C. §§ 1078(b) & (c). The Department provides reinsurance for the guarantee agency. *See* 20 U.S.C. § 1078(c); 34 C.F.R. § 682.404. If a lending institution is unable to collect on a student loan, it submits a claim to the guarantee agency. Once the guarantee agency pays the claim, it is required to make specific collection efforts, which the regulations describe as "loan servicing," before submitting a claim for reinsurance to the Department. *See* 34 C.F.R. § 682.-410. The Department will make a reinsurance payment only if the lending institution and the guarantee agency follow strict due diligence, servicing and collection requirements. *See* 34 C.F.R. § 682.406. After the Department pays reinsurance to the guarantee agency, the agency is permitted to continue to try to collect on the loan and may retain up to 30% of what it recovers. *See* 34 C.F.R. 682.404(e).

To participate in the student loan programs, an educational institution must apply to the Department for eligibility and certification. The HEA and the Department's regulations establish certain requirements that must be satisfied by an educational institution. *See* 20 U.S.C. § 1085; 34 C.F.R. Part 600 and § 682.600. Moreover, to begin and to continue to participate in any Title IV, HEA program, the educational institution must demonstrate that it meets the standards of financial responsibility and administrative capability set forth in the Department's regulations. *See* 34 C.F.R. §§ 668.13–668.15.

As part of the Omnibus Budget Reconciliation Act of 1990, P.L. 101–508, enacted November 5, 1990, Congress included the "Student Loan Default Prevention Initiative Act of 1990." Section 3004 of that Act, captioned "Ineligibility based on high default rates," amended § 435(a) of the Higher Education Act of 1965, 20 U.S.C. § 1085(a), by providing that educational institutions with cohort default rates [1] "for each of the three most recent fiscal years for which data are available" exceeding the statutory threshold of 35% [2] are not eligible to participate in the student loan programs.[3] 20 U.S.C. § 1085(a)(3). The Secretary calculates the cohort default rates from data supplied by the guarantee agencies.[4] After the Secretary determines that

---

1. *"Cohort default rate* means, for any fiscal year in which 30 or more current and former students at the institution enter repayment on [applicable student] loans received for attendance at the institution, the percentage of those current and former students who enter repayment in that fiscal year on ... loans received for attendance at that institution who default before the end of the following fiscal year." 56 Fed. Reg. 33,341 (to be codified at 34 C.F.R. § 668.-15(h)(1)(i)); *see* 20 U.S.C. § 1085(m). A student is deemed to "enter repayment" on the date on which he or she begins paying interest or principal (or both) on a student loan.

2. The thirty-five percent rate is applied to prior years if the calculations are made in 1991 or 1992. In subsequent years a thirty percent rate is applied to prior years. *See Assoc. of Accred. Schools v. Alexander,* 774 F.Supp. 655 (D.D.C. 1991) (Greene, H., J.).

3. Section 1085(a)(3) provides, in relevant part, that:

An institution whose cohort default rate is equal to or greater than the threshold percentage [thirty-five percent] ... for each of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for two succeeding fiscal years, unless ... the institution appeals the loss of its eligibility to the Secretary. The Secretary shall issue a decision on any such appeal within 45 days after its submission.... During such appeal, the Secretary may permit the institution to continue to participate in a program under this part.

4. The guarantee agencies submit computer tapes to Department that contain information on student loans. In 1990, these tapes included information on over 35 million loans. *See* Sedicum Declaration, ¶ 5. The Department then conducts systematic edits of the information on these tapes to ensure accuracy. *Id.*

an institution's cohort default rates make it ineligible to participate in the student loan programs, an institution has a limited right of appeal, which is more akin to a request for reconsideration, to the Secretary. The Secretary can permit an institution to continue to participate in the student loan programs only if "the institution demonstrates to the satisfaction of the Secretary that the Secretary's calculation of its cohort default rate is not accurate, and that recalculation would reduce its cohort default rate for any of the three fiscal years below the threshold percentage" or if "there are, in the judgment of the Secretary, exceptional mitigating circumstances." *Id.*

The Secretary has promulgated regulations governing appeals to him. *See* 56 Fed.Reg. 33,338 (Jul. 19, 1991) (to be codified at 34 C.F.R. Pt. 668). They require an institution appealing a cohort default rate determination to first "submit a written request to the guarantee agency or agencies that guaranteed the loans used in the calculation of the cohort default rate to verify the data used to calculate its cohort default rate." 56 Fed.Reg. 33340 (Jul. 19, 1991) (to be codified at 34 C.F.R. § 668.-15(g)(7)(i)). The institution must then show that "[a] recalculation with corrected data verified by the cognizant guarantee agency or agencies would produce a cohort default rate for any of those fiscal years below the threshold percentage." 56 Fed.Reg. 33339 (to be codified at 34 C.F.R. § 668.-15(g)(1)(i)(B)).

## II

On July 15, 1991, the Department sent a letter, signed by William L. Moran, Director, Student Financial Assistance Programs, to plaintiffs notifying them that their cohort default rates exceeded 35% for the relevant periods. Administrative Record [hereinafter A.R.], tabs 6 & 19. Attached to the letter was general information about the calculation of the cohort default rates and the specific backup data used to make the default calculations. *See id.*

On August 29, 1991, Moran sent plaintiffs a second letter notifying them that, effective September 2, 1992, their "school[s] will *no longer be eligible* to participate in the [student loan] programs" for the remainder of fiscal year 1991 and in fiscal years 1992 and 1993. A.R., tabs 7 & 20 (emphasis added). The letter informed plaintiffs of their right to appeal if, *inter alia,* "[t]he calculation of the school's cohort default rate for one or more of the relevant fiscal years is inaccurate and a recalculation based on corrected data, verified by the appropriate guarantee agency, would result in a cohort default rate for any one of the three years below 35 percent." *Id.* at 1. Plaintiffs would remain eligible during the appeal process provided they complied with the requirements and deadlines specified in the regulations. *Id.* Among other things, the letter informed plaintiffs that they "must provide the appropriate supporting documentation specified in the regulations in 34 CFR 668.-15(g)(7), (8) and (9)." *Id.* at 2. Enclosed was a description of the required material:

> The school must request in writing that the [guarantee agency] verify the suspected inaccuracies in the school's default rate. The request must include the full name and SSN of each borrower, and a detailed explanation of the suspected inaccuracies.... The school must forward a copy of the request to the Secretary.

*Id.,* enclosure at 1.

After receiving the first of these letters, plaintiffs contacted the appropriate guarantee agencies. Apparently unable to obtain certain information relevant to the calculation of default rates and the servicing of loans from the guarantee agencies, plaintiffs contacted the Department. By letter dated August 15, 1991, plaintiffs requested specific information on the default rates and the appeal process from Diane Sedicum, Section Chief, Default Management Section, Division of Audit and Program Review. Plaintiffs' Memorandum, Exhibit 6. For example, plaintiffs requested information regarding the servicing of loans [5] and

---

**5.** Question 1(a) of the August 15 letter inquired as follows:

possible procedures they could implement to reduce student defaults.[6] Plaintiffs had apparently submitted certain information to the guarantee agencies involving servicing errors that those agencies declined to consider, claiming servicing issues were to be resolved by the Department.[7] Having not received a response, plaintiffs sent another letter to Ms. Sedicum on September 3, 1991. *See* Plaintiffs' Memorandum, Exhibit 8; Coleman Declaration ¶ 7, Plaintiffs' Motion, Exhibit 2. On November 5, 1991, plaintiffs sent yet another letter seeking a response to their August 15, 1992, inquiry. Plaintiffs did not receive a response to any of these requests. *Id.*

By letter dated August 14, 1991, addressed to Alexia Roberts, Freedom of Information Officer, Department of Education, plaintiffs requested additional information pursuant to the Freedom of Information Act, 5 U.S.C. § 552. *See* Plaintiffs' Memorandum, Exhibit 9. Plaintiffs sent a follow up letter on September 3, 1991. *Id.,* Exhibit 10. The Department did not respond to these requests either. Coleman Declaration ¶ 7, Plaintiffs' Motion, Exhibit 2.

Unsuccessful in their efforts to acquire additional information but believing defendant's calculation of their cohort default rates was inconsistent with information in plaintiffs' internal records, they requested that the appropriate guarantee agencies verify the data relied on by the Secretary to calculate the default rates. Plaintiffs included with these requests lists prepared by the accounting firm of Coopers & Lybrand from plaintiffs' academic and financial aid files. The lists identified specific student accounts that they believed were erroneously included in the Secretary's calculations of plaintiffs' cohort default rates. The errors identified by Coopers & Lybrand fell into seven categories or "types." Initially, the accountants calculated a projected repayment date[8] for each student based on that student's last date of attendance at plaintiffs' institutions. They noted numerous instances in which a student's projected repayment date indicated that the defendant had included the defaulting student in the wrong cohort period for calculation of the default rate. Applying the Department's regulations for loan servicing and collection to these projected repayment dates, Coopers & Lybrand identified several additional types of errors.[9]

---

34 C.F.R., Sec. 668.15(h)(1)(i), published July 19, 1991, states in part that loans subject to improper servicing or collection are excluded from the default rate calculation. Please provide a clear definition of the term "improper servicing."

6. Question 9 inquired:
Would the Federal Regulations prevent a college from establishing a loan fund whose purpose would be to assist a GSL borrower who has fallen behind on payments? There would be a promissory note signed. Would the monies have to be paid directly to the borrower or could the college send the payment directly to the lender? In such event, would the student's GSL loan be considered in default for the purposes of the cohort default rate definition as set forth in 34 C.F.R. 668.15(h)(1)(i)?

7. Question 1(b) inquired:
We have been informed by a guarantee agency that the cohort rate calculation will include all loans which did not receive the proper grace period, based on the student's last date of attendance. The guarantee agency indicated that this matter was a servicing issue, only to be resolved by the Department of Education (DEd). We disagree with the guarantee agencies' understanding regarding this

matter. What is the procedure we should follow to obtain final disposition of this and other servicing issues?

8. The projected repayment date is the date on which a student "enters repayment." *See supra* note 1.

9. Plaintiffs allege that because the lending institutions and guarantee agencies' were using incorrect repayment dates for some of the loans to plaintiffs' students, they were either accelerating or delaying their collection activities, which could have contributed to those students defaulting on their loans. The Higher Education Act directs the Secretary to exclude from the cohort default calculations student loans that, "due to improper servicing or collection, would result in an inaccurate or an incomplete calculation of the cohort default rates." 20 U.S.C. § 1085(m). Plaintiffs argue that several specific loan servicing errors should be excluded because they flow directly from the lending institutions and guarantee agencies' use of the improper repayment dates: (1) students were not given a full grace period; (2) students were given an excessive grace period; and (3) students did not receive the full 180 days of due diligence required by the regulations. Plaintiffs

Based on the first type of error alone, plaintiffs allege that their actual default rates would fall below 35% in at least one of the three prior years. According to the Secretary the 1987 cohort default rate for Atlanta College is 35.3 percent, and the 1988 cohort default rate for Louisville College is 35.7 percent. However, plaintiffs identified by name and social security number, as required by the Department's regulations, 26 students whose projected date of repayment indicated that they were incorrectly included in the 1987 cohort period for Atlanta College and 45 students in the 1988 cohort period for Louisville College. Plaintiffs claim, and defendant does not dispute, that if two additional names were removed from the list of Atlanta College students in default in 1987 and seven additional names were removed from the Louisville College 1988 list, the default rate for both of those institutions would fall below 35% and each would remain eligible to participate in the student loan program.

In total, Coopers & Lybrand identified several hundred potential errors. *See* Plaintiffs Motion for Preliminary Injunction, Exhibits 2A–2G. Plaintiffs claim that if the Secretary were to recalculate their default rates, adjusting the guarantee agencies' data to account for these errors, they would continue to be eligible to participate in the student loan programs.

In response to plaintiffs' submissions, the guarantee agencies partially revised their data. However, out of the hundreds of potential errors listed by plaintiffs, the guarantee agencies acknowledged only ten. The guarantee agencies did not explain why these ten errors were acknowledged and the others were not. Coleman Declaration ¶ 6, Plaintiffs' Motion for Preliminary Injunction, Exhibit 2. In fact, one of the

two agencies that guaranteed loans to plaintiffs' students indicated that it was simply confirming or denying its data based on information provided by the lending institutions and therefore that it would not be able to confirm certain types of errors identified by plaintiffs from their own internal records. *Id.* Instead, the guarantee agency suggested that plaintiffs "present[ ] these perceived error types to the Department of Education as part of [their] appeal documentation." Letter from Ms. Sally Hein, Manager, School and Lender Eligibility, USA Funds, to Mr. Joseph Whelan, Chief Financial Officer, Phillips Colleges, (Oct. 7, 1991), Plaintiffs Motion for Preliminary Injunction, Exhibit 17.

On October 2, 1991 plaintiffs appealed their terminations to the Secretary and, following the advice of the guarantee agency, requested that the Secretary review the lists of students prepared by Coopers & Lybrand. In a letter from Ernest C. Canellos, Acting Deputy Assistant Secretary for Student Financial Assistance, dated January 3, 1992, the Secretary announced his final decisions. *See* Letter from Ernest C. Canellos, Acting Deputy Assistant Secretary for Student Financial Assistance to Mr. Joseph Whelan, Chief Financial Officer, Atlanta College of Medical and Dental Careers (Appeal Decision January 3, 1992), A.R., tab 18; Letter from Ernest C. Canellos to Mr. Joseph Whelan (Appeal Decision January 3, 1992), A.R., tab 33 [hereinafter "Decision Letters"]. The Canellos letter acknowledged only the ten errors that were verified by the guarantee agencies. Since adjusting for these ten errors did not lower plaintiffs' cohort default rates for any one of the relevant years, the Secretary rejected plaintiffs' appeals.[10] *Compare id. with* Letters from the guarantee agencies to Mr.

allege three additional types of errors; however, they only account for a fraction of the students that plaintiffs challenged.

**10.** In addition, the Secretary acknowledged that five Atlanta College students who defaulted in the 1987 cohort period, had been mistakenly reported in the 1988 cohort period. The Secretary shifted these accounts to the 1987 cohort calculation. Plaintiffs, who unsuccessfully requested information on this question from the Department prior to their appeals, *see supra*

note 7, claim that these students must be removed from the cohort default calculations entirely. By statute, the Secretary is only required to exclude loans that, "due to improper servicing or collection, would result in an inaccurate or an incomplete calculation of the cohort default rate." 20 U.S.C. § 1085(m). If the Secretary counts a student in the wrong cohort period for calculation of default rates, it would involve an accounting error and would not necessarily indicate servicing or collection errors, since loan servicing and collection are per-

Joseph Whelan, Plaintiffs' Memorandum, Exhibits 16–18. The Canellos letters did not discuss why the other errors identified by plaintiffs were not acknowledged. Moreover, the Canellos letters implied that the decisionmaker only considered "information confirmed by the guarantee agenc[ies]." Decision Letters at 1. Instead, the letters stated, *inter alia*, in conclusory terms that:

> The Department has determined that the accounts listed below were not properly treated in the calculation of the cohort default rates. Accounts *not* listed below were properly treated in the original calculation of the cohort default rates.

*Id.* at 2.

On January 23, 1992, plaintiffs filed this suit. A February 26, 1992 oral argument on plaintiffs' motion for a preliminary injunction exposed the failure of the Canellos letters, which were the subject of the appeal, to articulate reviewable bases for their conclusions, particularly with respect to the first type of error. *See Getty v. Federal Savings and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986). The Court ordered counsel to confer and file a proposed order that would require the Department to articulate its decision in such a way that it would be susceptible to the limited judicial review to which plaintiffs were entitled.

On March 4, 1992, without submitting a proposed order, the Department filed what purported to be supplemental decision letters, signed by Gerald R. Riso, Deputy Assistant Secretary for Student Financial Assistance, "to cure any defect that could be found in the original letters by making the basis of the Department's decision clear." Defendant's Supplemental Memorandum, at 1. The Riso letters stated that

the decisionmakers did not consider the lists of students prepared by Coopers & Lybrand; therefore, they did not consider student accounts other than those verified by the guarantee agencies. Riso stated that Coopers & Lybrand's analysis "is based on a fundamentally flawed methodology because it does not allow for other legitimate reasons for a delay in a student being placed into repayment." Letter from Gerald R. Riso, Deputy Assistant Secretary for Student Financial Assistance, to Mr. Joseph Whelan, Chief Financial Officer, Atlanta College of Medical and Dental Careers (Explanation of Appeal Decision March 4, 1992), Defendant's Supplemental Memorandum filed March 4, 1992, Exhibit 1, at 1; Letter from Gerald R. Riso to Mr. Joseph Whelan (Explanation of Appeal Decision March 4, 1992), *Id.*, Exhibit 2, at 1 [hereinafter "Explanatory Letters"]. The reasons for delay not addressed by Coopers & Lybrand allegedly included "the lender utilizing the anticipated graduation date because it has not been notified of any change in enrollment status, or the lender's use of a month specific repayment date calculation instead of a day specific repayment date calculation as permitted by the Department's regulations." *Id.*

Plaintiffs claim, and the Department does not contest, that they used "every single piece of information available to them" in their attempt to show errors in the default rates. *Compare* Plaintiffs' Reply to Defendant's Motion at 7 *with* Defendant's Reply on his Motion to Dismiss at 3.[11] Thus, the Department rejected the Coopers & Lybrand submission because it failed to address information that plaintiffs did not have, information that plaintiffs could only apparently obtain from the guarantee agencies or the Department.

---

formed by the lending institutions and the guarantee agencies. If, however, the lending institutions or the guarantee agencies treated the student as belonging in an incorrect cohort period for repayment purposes and required repayment based on these errors, excludable errors as defined by 20 U.S.C. § 1085(m) might result. Given the Department's conclusory decision letters, it is impossible to determine whether shifting the incorrect accounts was permissible as the Department asserts.

11. The Department also claims that dates of repayment could have been delayed if the students enrolled in another institution prior to the expiration of the repayment grace period. Unlike the other hypothetical grounds for disparity between the Department's data and that of the plaintiffs, the Department specifically stated this information was available to plaintiffs; however, this omission accounted for only seven of the over one-hundred students plaintiffs identified as error type 1 for Atlanta College. *See* Explanatory Letter for Atlanta College at 3.

On March 9, 1992, plaintiffs submitted a proposed remand order and, because of the Department's alleged refusal to discuss the proposed order with them, a proposed preliminary injunction order. Thereafter, the Court ordered the parties to submit a joint proposed order that would provide security sufficient to reimburse the government in the event that a Court order vacating the defendant's decisions to suspend loan guarantees to plaintiffs were later reversed. The parties submitted a stipulated order on March 20, 1992 that would establish a procedure that would require plaintiffs to provide security in an amount equal to a percentage of each student loan guaranteed pursuant to Court order, with the percentage to be determined by the Court.

On May 1, 1992, the parties filed statements regarding the exact percentage of the proposed bonding arrangement. Defendant argues that the percentage should reflect the recent historical default rates of plaintiffs. The average of the schools' default rates for the three years considered by defendant in making the ineligibility determination at issue here is 45.1% for Atlanta College and 46.6% for Louisville College. Plaintiffs counter that because these historic rates were calculated from erroneous data, the Court should adopt the 35% threshold ineligibility rate imposed by the HEA. Since the security condition was designed to financially protect the government in the event that this Court's Order is reversed and the January 3, 1992 decisions are reinstated, the percentage should be keyed to plaintiffs' average historic default experience as calculated in those decisions.

### III

### A.

As an initial matter, it is necessary to address plaintiffs' claim that they were entitled to an evidentiary hearing before being declared ineligible to participate in the student loan programs. Plaintiffs insist that the Secretary's initial ineligibility determination pursuant to section 1085(a)(3) is a "termination" within the meaning of 20 U.S.C. § 1094(c), requiring reasonable notice and a hearing. Section 1094(c) requires the Secretary to conduct a formal hearing before terminating an "otherwise eligible institution." [12] 20 U.S.C. § 1094(c)(1)(D). Section 1094(d) specifically defines an "eligible institution" by reference to § 1085. That section, by its terms, expressly excludes from eligibility institutions with cohort default rates exceeding 35% for three consecutive years. It provides that "[a]n institution whose cohort default rate is equal to or greater than the threshold percentage ... shall not be eligible to participate...." 20 U.S.C. § 1085(a)(3). Thus, by operation of § 1085 plaintiffs were not "otherwise eligible" within the meaning of § 1094 and are not entitled to a formal hearing.

Plaintiffs also argue that, because they had participated in the programs for in excess of eight years and did not become ineligible until the Secretary denied their appeal, section 1094 requires the Secretary to afford them a hearing on appeal from the initial calculation. However, Congress adopted § 1085(a)(3) as part of the Omnibus Budget Reconciliation Act of 1990, P.L. 101–508, enacted November 5, 1990, in part, to achieve immediate budgetary savings. *See Association of Accred. Cosmetology S. v. Alexander,* 774 F.Supp. 655, 659 (D.D.C.1991). To this end Congress limited the appeal process relating to § 1085, the section which defines eligibility for participation in the student loan programs, and included it in that section separate and apart from the formal hearing requirements of § 1094. Under this limited process, an institution has thirty days to appeal its loss of eligibility and the Secretary must issue his decision within forty-five days thereafter. The statute also limits the grounds on which an institution may appeal to: (1) inaccuracies in the calculation of default rates, and (2) exceptional mitigating circumstances. Moreover, the statute places the burden on the terminated institution to "demonstrate[ ] to the satisfaction of the Secretary" any errors in his

---

**12.** Section 1094(c)(1)(D) provides, in relevant part, for "the limitation, suspension or termination of the eligibility for any program under this subchapter ... of any otherwise eligible institution ... after reasonable notice and opportunity for hearing on the record...."

calculations or mitigating circumstances that make loss of eligibility inequitable. In contrast, under § 1094 and the Administrative Procedures Act the Secretary would have the burden of proof. Finally, section 1085(a)(3) does not mention 20 U.S.C. § 1094. Nor does it use the words "termination" or "hearing".

In enacting section 1085(a)(3), Congress established new requirements for participation in the student loan programs. As a technical matter, the Secretary was not terminating the institutions' participation in the programs, but was determining whether the institutions met the threshold requirements for what became in effect original participation in the programs. Accordingly, Congress provided a self-contained appeal process in § 1085 to determine whether, by definition, a school is, *ab initio*, eligible to participate. These eligibility determinations, and the procedure through which they are to be made, are antecedent to and independent of the formal hearing requirements of § 1094. *Cf. Beth Rochel Seminary v. Bennett*, 825 F.2d 478, 481–82 (D.C.Cir.1987). Once plaintiffs became ineligible institutions as defined by § 1085, they were restricted to the limited appeals procedure afforded by that section. Thus, as Congress clearly intended to exempt ineligibility determinations based on excessive cohort default rates from the hearing requirements of section 1094, plaintiffs are not entitled to an evidentiary hearing.

### B.

■ In this case, however, the appeals process was implemented in an arbitrary and capricious manner. The Department's initial decision letters do not provide any reasoned basis for including some of the errors identified by plaintiffs in the default calculations and excluding others. The Canellos letters state that the accounts not listed were "properly treated". "Stating that a factor was considered, however, is not a substitute for considering it." *Getty v. Federal Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986).

Moreover, the Department's letters imply that only the guarantee agency data was considered and not plaintiffs' additional information:

> We have reviewed the documents submitted by your school and the response(s) of the guarantee agency or agencies that guaranteed loans used in the calculation of your school's cohort default rate. *Based on that information confirmed by the guarantee agency or agencies,* we find that it did not produce a cohort default rate for any of the relevant fiscal years below 35 percent. As a result, your school's appeal is denied.

Exhibit 18, at 1 (emphasis added). The letters address only those corrections in the underlying default data made by the guarantee agencies. They conspicuously do not address plaintiffs' evidence. Thus, it is more likely than not likely that the Secretary did not conduct an independent review of the data submitted by the guarantee agencies and by the plaintiff, but rather adopted the findings of the guarantee agencies.[13]

In any event, a reviewing court "cannot determine whether an agency has acted correctly unless [it is] told what factors are important and why they are relevant. Therefore, an agency must provide a reasoned explanation for its actions and articulate with some clarity the standards that governed its decision." *Moon v. United States Dept. of Labor*, 727 F.2d 1315, 1318 (D.C.Cir.1984). Although the Secretary is not required to provide formal findings of fact or detailed statements of reasons, he must provide an explanation sufficient to permit a reviewing court to determine whether his decision "was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *see also Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). Such a review is impossible here, because the Secretary does not indicate whether he actually considered plaintiffs' submissions and, if he did not, why he declined to do so.

---

**13.** This conclusion is corroborated by the Riso letters that explained the Department's reasons for originally denying plaintiffs' appeals. *See infra.*

The Department's supplemental letters, which did not involve reconsideration of the original decisions, unsuccessfully attempt to remedy this by "provid[ing] further explanation of the Department's use of the information provided by [the] school[s] in [their] appeal[s]." Explanatory Letters, at 1. However, instead of explaining why some students that Coopers & Lybrand identified as erroneously included in the default calculations were acknowledged and others were not, the Department explains, *inter alia*, that it did not consider most of the supplemental data provided by plaintiffs because it "is based on a fundamentally flawed methodology."

The Department attempts to justify its decision to refuse to consider significant portions of plaintiffs' appeals by identifying a series of hypothetical considerations that were not addressed in Coopers & Lybrand's methodology. The Department contends that plaintiffs must produce evidence that excludes each of these hypotheticals as a possible reason for the discrepancies between the guarantee agencies' data and the information contained in the schools' internal records before it will consider Coopers & Lybrand's lists. However, the schools' academic and financial aid records do not include this information, because "[t]he lender, and not the school, is responsible for properly servicing the loan and keeping records relating to the date the student entered repayment, the beginning and end of the grace period, and the due diligence utilized in collecting the loan." Defendant's Memorandum in Support of its Motion to Dismiss at 11; *see* Sedicum Declaration ¶ 14, *Id.*, Exhibit 2.

Plaintiffs are thus placed in a Catch–22 situation. The Department relies exclusively on the guarantee agencies' data, which it presumes to be accurate, to calculate the default rates, on which plaintiffs' eligibility turns. The Department claims this reliance is justified because the "appeals' process provides the school with an adequate opportunity to provide sufficient evidence to overcome the presumption that the guarantee agency is correct." Motion to Dismiss at 17. However, to mount a successful appeal the schools must produce information that is not their files and is apparently not available to them. By requiring the schools to produce data that is not available to them before it will even consider errors alleged by them, the Department has transformed its initial reliance on the guarantee agencies' data into an irrebuttable presumption, and has thereby rendered the appeal process created in § 1085 arbitrary and capricious. At the very least, the Secretary must consider the errors alleged in the Coopers & Lybrand lists and identify, based on data available to the Department, why the guarantee agencies' data pertaining to these students, from which the Secretary calculated the default rates, differ from the information contained in the schools' internal records.

Accordingly, the accompanying Order vacates the decisions of January 3, 1992, and remands this matter to the defendant for further consideration and action consistent with this opinion. In the interim, the renewed proceedings to be conducted by defendant should be treated as a resumption of the appeal process so that plaintiffs will remain eligible to participate in the programs pursuant to the statement to that effect on page 2 of defendant's August 29, 1991, letters to plaintiffs.[14] It will also condition plaintiffs' eligibility during the renewed appeal process on plaintiffs' provision of satisfactory security for the government.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 7th day of May, 1992, hereby

ORDERED: that plaintiffs' motion for a declaratory judgment should be, and is hereby, GRANTED; and it is further

ORDERED: that defendant's motion to dismiss, or in the alternative for summary judgment, should be, and is hereby, DENIED; and it is further

---

14. *Compare Thomas v. Bennett,* 856 F.2d 1165, 1168 (8th Cir.1988) and *Ulstein Maritime, Ltd. v. U.S.,* 833 F.2d 1052, 1055 (1st Cir.1987) cited with approval in Defendant's Reply on His Mo-

tion to Dismiss at 15. *See also Oklahoma Aerotronics, Inc. v. United States,* 661 F.2d 976, 977 (D.C.Cir.1981).

ORDERED: that the decisions of the defendant terminating plaintiffs' eligibility to participate in the Guaranteed Student Loan Programs as of January 3, 1992, should be, and are hereby, VACATED; and it is further

ORDERED: that this matter should be, and is hereby, REMANDED to defendant who shall promptly review the data submitted by plaintiffs to the guarantee agencies, which include the lists prepared by the accounting firm of Coopers & Lybrand, and furnish plaintiffs with a reasoned decision that addresses that data; and it is further

DECLARED: that plaintiffs shall remain eligible to participate in the Guaranteed Student Loan Programs during the appeals process pursuant to the procedure prescribed in the Department of Education's August 29, 1991, letters to plaintiffs; and it is further

DECLARED: that defendant's obligation to continue plaintiffs' status as eligible to participate in the Guaranteed Student Loan programs during this appeals process is conditioned upon their posting a bond in the amount of 45.1% for Atlanta College of Medical and Dental Careers and 46.6% for Louisville College of Medical and Dental Careers of each loan guaranteed by defendant, according to the terms of the proposed Stipulated Order Establishing Bonding Requirement, a copy of which is annexed hereto and made a part hereof.

## APPENDIX

United States District Court,
District of Columbia.

Atlanta College of Medical and Dental Careers, Inc., and Louisville College of Medical and Dental Careers, Inc., a Kentucky Corporation, d/b/a Phillips College of Louisville, Plaintiffs,

v.

Lamar Alexander, Secretary of Education, in his official capacity, Defendant.

Civil Action File No. 92–0200 (LFO).

STIPULATED ORDER ESTABLISHING BONDING REQUIREMENT

Whereas the Court has this ___ day of March 1992, issued an order vacating and remanding the decision of the Secretary of Education terminating the eligibility of the plaintiff colleges from participation in the Guaranteed Student Loan Program (GSLP), said decision having been originally issued on January 3, 1992; and

Whereas, the parties wish to enter into an agreed Order establishing a procedure whereby each of the plaintiff schools may participate in the GSLP as of the date that the original decision was issued (January 3, 1992) and to protect the defendant from the risk of significant financial loss until such time as a final Order is received in this matter, whether from the District Court or a court of higher jurisdiction; and

Whereas, both parties have agreed that Plaintiffs may post a bond as more fully set out below and that Defendant will accept such a bond as surety against potential financial loss; it is hereby Agreed:

1. At such time as students enrolled at Plaintiff colleges, either singularly or together, are able to obtain loans under the GSLP from appropriate lenders, they or their corporate parent, Phillips College, Inc., will purchase for the sole benefit of Defendant a bond from a bonding company holding a certificate of authority as listed in Treasury Circular 570, or other company acceptable to Defendant, approval of Defendant not to be unreasonably withheld, in the amount of –% of the face amount of each loan certified to students enrolled in either one or both of the plaintiff colleges subsequent to the date of this Order.

2. In establishing the bond, plaintiffs shall only be required to purchase, or increase the amount of, the bond once for all loans certified during each month, such purchase or increase to occur not later than the 30th day after the end of the month in which such loans were certified.

3. Contemporaneous with the purchase or increase of the bond or bonds, Plaintiffs shall provide Defendant, at an office designated by Defendant, with evidence of the issuance of or increase in the bond or

bonds together with a listing of the loans subsumed under such bond or bonds, setting forth the principal sum of each such loan and the name and social security number of each borrower.

4. The bond or bonds purchased pursuant to this Order shall remain in effect only so long as a final order in this proceeding has not been issued, or both parties have determined not to appeal said final order. If a timely appeal is taken then said bond or bonds shall remain in effect until a final order is obtained and no further right of appeal exists or until such time as the party or parties having the right to appeal notifies the other that it waives its right of appeal, whichever is shorter.

5. Should Defendant ultimately receive a favorable decision reinstating its January 3, 1992 decision as to either one or both of the colleges, Defendant shall be entitled to the full amount of the bond or bonds. Defendant shall, however, remit to the plaintiffs any amount of the bond which is left after all defaults have been accounted for from all loans issued during the term of this Order.

Robert Shapiro, Esq.
Asst. U.S. Attorney
Attorney for Defendant

So Ordered:

Louis F. Oberdorfer

United States District Court

Jonathan B. Hill, Esq.
Attorney for Plaintiff

Dated: March , 1992