**CANTERBURY CAREER SCHOOL, INC., Plaintiff,**

v.

**Richard W. RILEY, Secretary of the United States Department of Education, in his official capacity, Defendant.**

**Civ. A. No. 93–3843 (MLP).**

United States District Court, D. New Jersey.

Oct. 14, 1993.

---

David O. Drake, Salt Lake City, UT, James H. Landgraf, Guest, Domzalski, Kurts & Landgraf, Burlington, NJ, for plaintiff.

Lawrence G. Brett, Office of the Gen. Counsel, U.S. Dept. of Educ., Washington, DC, Irene Dowdy, Asst. U.S. Atty., Trenton, NJ, for defendant.

## OPINION

PARELL, District Judge.

This matter comes before the court on application by plaintiff, Canterbury Career Schools, Inc., for a preliminary injunction seeking (a) to prevent defendant, Richard W. Riley, in his official capacity as Secretary of the United States Department of Education, from publishing or continuing to publish certain cohort default rates which plaintiff alleges have been erroneously calculated by defendant; (b) to mandate defendant to suspend these rates and publish appropriate notice of such suspension; and (c) for any other relief which the court deems just and proper. Also before the court is defendant's motion to dismiss for lack of subject matter jurisdiction. The following opinion constitutes the findings of the court on this application for preliminary relief and motion to dismiss. For the reasons stated, the preliminary injunction is granted and the motion to dismiss is denied.

## BACKGROUND

Plaintiff, Canterbury Career Schools, Inc., is a New Jersey corporation which operates a post-secondary school with its main campus located in Nevada and branch campuses located in California, Pennsylvania and New Jersey. Plaintiff provides career training for a variety of occupations, including tractor trailer driving, secretarial positions, medical support positions, bartending, word processing and a few technical careers. Since 1987 plaintiff has been accredited without interruption by the Accrediting Counsel for Continuing Education & Training. A substantial percentage of the students who attend plaintiff's schools are economically disadvantaged and, at the time of enrollment, many of these students are on welfare.

Approximately 72% of the students who enroll at plaintiff's school succeed in completing their courses of study and go on to graduate. Of those graduates, plaintiff is successful in placing approximately 88% in education-related jobs.[1] Plaintiff asserts that its school is reputed as providing students with quality education and for preparing those students to perform well in their chosen occupations

Defendant, Richard W. Riley, has been sued by plaintiff in his official capacity as the Secretary of the United States Department of Education. Defendant is responsible for administering and implementing the Federal Family Educational Loan programs ("FFEL") authorized by Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 et seq. Plaintiff has a Participation Agreement with the Secretary, in accordance with 20 U.S.C. § 1094, whereby plaintiff is fully eligible to participate in the FFEL programs.

The purpose of the FFEL programs[2] is to enable students to obtain federally guaranteed loans. Under the FFEL programs, a student receives a loan from a participating lender, usually a bank, to pay tuition, fees and living expenses related to attendance at

---

1. These statistics are based upon information provided by plaintiff in its Verified Complaint.

2. FFEL collectively refers to four different loan programs: (1) the Federal Stafford Loan Program, (2) the Federal Supplemental Loans for Students Program, (3) the Federal PLUS Program, and (4) the Federal Consolidation Loan Program. 34 C.F.R. 682.100(a).

an eligible post-secondary institution. Repayment of the student loan is insured by a guaranty agency. 20 U.S.C. § 1078(b)–(c); 34 C.F.R. 682.100 and 682.401. In the event of default, the guaranty agency pays the lender the unpaid amount of the outstanding loan. The Department of Education ("DOE") "re-insures" the guaranty agencies for payments made to the lenders. 20 U.S.C. § 1078(c); 34 C.F.R. 682.100 and 682.404.

However, in order for the lender to collect reimbursement from the guaranty agency on a defaulted loan, the lender must demonstrate that "due diligence" in the collection of the loan was properly performed[3]. Lenders must perform "due diligence" for a period of at least 180 days. 34 C.F.R. 682.411. This 180 day period begins either (1) 30 days after the lender discovers that the student borrower has entered the repayment period[4] or (2) the day after the student borrower misses a payment, whichever is later. 34 C.F.R. 682.-411(b). After the 180 day period has expired, the loan goes into default and the lender submits a claim to the guaranty agency for reimbursement. Before a reimbursement claim is paid, the guaranty agency is responsible for reviewing the lender's records to ensure that the lender has, in fact, properly performed "due diligence". 34 C.F.R. § 682.406(a)(1) and (3). If the lender has not properly performed "due diligence", then the guaranty agency is not authorized to reimburse the lender. Once the guaranty agency pays a claim, it is required to employ collection or servicing efforts of its own before seeking reimbursement from DOE. 34 C.F.R. § 682.410(b)(4). If those efforts fail, then the guaranty agency may seek reimbursement from DOE.

Because of the increasing monetary drain on DOE in paying defaulted loans, Congress amended HEA in 1990 by passing the Student Loan Default Prevention Initiative Act (20 U.S.C. § 1085). The purpose of 20 U.S.C. § 1085 was to reduce the number of defaulted loans by revoking the eligibility of schools whose students had high rates of default. Section 1085 provides that any school whose "cohort default rate" ("CDR") exceeds a certain threshold percentage[5] for three consecutive years loses its eligibility for participation in the FFEL program for the fiscal year in which the determination is made and for the two succeeding years. 20 U.S.C. 1085(a)(2)(A).

A school's CDR is calculated by the Secretary of DOE by taking the number of current or former students who enter the repayment period in a given fiscal year and dividing that number by the number of those students who default by the end of the following fiscal year. 20 U.S.C. § 1085(m)(1)(A). As specifically set forth in the statute, the Secretary of DOE, in calculating a school's CDR, is to "exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate." 20 U.S.C. § 1085(m)(1)(B). The Secretary relies upon information provided by the guaranty agencies to calculate CDRs. This information is in the form of a "tape dump," which is a computer tape listing information about each loan insured by the guaranty agency. The information contained on the "tape dump" indicates the status of each loan, specifically indicating whether the loan is in default or repayment.

If a school's calculated CDR exceeds the statutory threshold percentage, the school may appeal to the Secretary of DOE on the ground that (1) the calculation of the CDR is inaccurate and that recalculation would reduce the CDR to below the threshold percentage, and/or that (2) due to exceptional

---

3. "Due diligence" is defined by 34 C.F.R. 682.-411. At a minimum, proper "due diligence" requires the lender to send forceful collection letters to student borrowers, to make telephone calls to student borrowers, to request preclaims assistance from the guaranty agency and to notify the school of the request for preclaims assistance, and to use skip-tracing techniques in order to locate student borrowers who may have moved and failed to notify the lender of change of address.

4. Student borrowers enter the repayment period, meaning they are required to begin repayment, on most FFEL loans six months following the month the student is no longer enrolled at an eligible institution on at least a half-time basis. 34 C.F.R. 682.209(a)(2)(ii).

5. The threshold percentage applicable to the CDRs at issue here is 30%.

mitigating circumstances, loss of eligibility based on the calculated CDR would be inequitable. 20 U.S.C. § 1085(a)(2)(A)(i)–(ii).

The Department of Education published a letter commonly referred to as the May, 1993 "Dear Colleague Letter" ("May, 1993 DCL") which set forth procedures to be followed in challenging the calculation of a school's CDR on appeal. (Def.'s Ex. 1 attached to declaration of M. Geneva Coombs). If a school wishes to appeal on the first ground, by the terms of the May, 1993 DCL, it must submit specific relevant data to the guaranty agencies within ten days of receiving notification from DOE of the calculated CDR. May, 1993 DCL at 3. The guaranty agencies are to respond by either agreeing with the school's conclusions regarding disputed loans or by providing complete copies of servicing records for disputed loans. May, 1993 DCL at 4. After the guaranty agencies respond, the school then has five days in which to provide DOE with all the necessary information upon which the appeal is based. May, 1993 DCL at 4.

The cohort default rates calculated by defendant for plaintiff's school are (1) 39% for 1989 (2) 54.8% for 1990, and (3) 49.7% for 1991. Each of these calculated rates exceeds the "threshold percentage" as that term is defined by 20 U.S.C. § 1085(a)(2)(B).

Plaintiff received notification from DOE of its calculated CDR for fiscal year 1991 on or about August 13, 1993, whereupon plaintiff immediately applied in the federal district court in Nevada for a temporary restraining order and a preliminary injunction against defendant. By order dated August 13, 1993, the Nevada court dismissed plaintiff's action without prejudice for lack of venue. Plaintiff then filed a Verified Complaint with this Court seeking a temporary restraining order and a preliminary injunction against defen-

dant, specifically seeking to prevent defendant from publishing or continuing to publish the CDRs calculated by defendant for plaintiff's school for the fiscal years 1989, 1990 and 1991 and to mandate defendant to suspend these CDRs and to publish appropriate notice of such suspension. On August 26, 1993, Judge Jerome B. Simandle held an emergency hearing on plaintiff's request for a temporary restraining order, and by order dated that same day the request was denied.[6] At that time, the Court scheduled September 23, 1993 as the date for the hearing on plaintiff's request for a preliminary injunction and on defendant's anticipated motion to dismiss. The evidentiary hearing on these motions commenced on September 23, 1993 and was continued on September 29 and September 30, 1993.[7]

## DISCUSSION

### I. JURISDICTION

Jurisdiction over this action is found under 20 U.S.C. § 1082(a)(2), which provides federal district courts with original jurisdiction over civil actions against the Secretary of the Department of Education.

▮ Defendant alleges that the "anti-injunction" provision contained in this section precludes a district court from issuing an injunction against the Secretary. In most situations, this type of "anti-injunction" provision would preclude such an injunction. However, where it is determined that a federal officer has exceeded the bounds of his or her authority, there exists a recognized limitation upon the applicability of such an "anti-injunction" provision. *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir.1987) ("the no-injunction language . . . should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would

---

**6.** Judge Simandle further ordered that plaintiff was deemed to have filed a timely administrative appeal and extended the time for plaintiff to formally file its administrative appeal papers to September 7, 1993. Since the date of Judge Simandle's order plaintiff has been pursuing its administrative appeal.

**7.** Gary A. Musselman provided expert testimony on behalf of plaintiff. Stanton M. Pikus, the president and CEO of plaintiff, also testified on

behalf of plaintiff. M. Geneva Coombs, the Acting Chief of the Default Management Section in the Washington D.C. Office of Student Financial Assistance of DOE, provided testimony on behalf of defendant. Ann Marie Cimino, a lender review specialist employed by DOE, also testified on behalf of defendant. The declarations of Gary A. Musselman, Stanton M. Pikus and M. Geneva Coombs were also filed by the respective parties.

not interfere with internal agency operations"); *Jones v. Freeman,* 400 F.2d 383, 387 (8th Cir.1968) ("immunity from injunction process may not be claimed by a federal officer acting in excess of his authority"); *Valley Forge Flag Co., Inc. v. Kleppe,* 506 F.2d 243, 245 (D.C.Cir.1974).

Courts have interpreted the "anti-injunction" provision contained in 20 U.S.C. § 1082(a)(2) in similar actions against the Secretary of the Department of Education and have held that where the Secretary has exceeded the scope of his authority, this provision does not preclude the district court from granting equitable relief. *International Dealers School, Inc. v. Riley,* CV–S–93–451–LDG (D.Nev. June 2, 1993); *Climate Control Institute of Oklahoma, Inc. v. Alexander,* No. 93–C–55–E (N.D.Okla. February 4, 1993); *Concorde Career Colleges, Inc. v. Alexander,* No. 92–1064–CV–W–6 (W.D.Mo. December 23, 1992); *CBM Education Center of San Antonio, Inc. v. Alexander,* Adv. No. 92–2012–M (Bankr.S.D.Tex. February 14, 1992). Thus, if defendant, the Secretary of the Department of Education, has exceeded the scope of his authority, then this Court has jurisdiction to grant appropriate injunctive relief notwithstanding the "anti-injunction" provision.

Plaintiff argues that defendant has acted outside the scope of the authority vested in him under 20 U.S.C. § 1085(m) by failing to exclude improperly serviced or collected loans from the calculation of plaintiff's CDR and by uncritically relying upon the default conclusions of the guaranty agencies without any sort of independent review of these conclusions.

Section 1085(m)(1)(B) provides that "the Secretary *shall* ..., in calculating the cohort default rate, exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate."

■ By the clear language of this statute, the Secretary has no discretion under § 1085(m)(1)(B) regarding the inclusion of loans which are improperly serviced or collected and which would result in an inaccurate calculation of the cohort default rate: such loans are not to be included in the calculation of a CDR. To this effect, the statute mandates that the Secretary must determine whether loans have been improperly serviced or collected *before a CDR is calculated.*

Plaintiff has presented evidence which indicates that the Secretary, in calculating plaintiff's CDR, failed to exclude loans which were improperly serviced. Plaintiff's expert, Gary Musselman, testified at length regarding his analysis of the information available to plaintiff as it compared with the information provided by DOE. His analysis identifies numerous loans with potential servicing errors which were included in the Secretary's calculation of plaintiff's CDRs. Mr. Musselman categorized each disputed loan as having one of five types of potential servicing errors: (1) loans with improper "due diligence" cycles (2) loans improperly converted to repayment (3) loans with no notice provided to the school of a request for preclaims assistance (4) loans with refunds improperly credited, and (5) loans made to students attending subsequent schools. Mr. Musselman compiled a list based on the results of his analysis which identifies each disputed loan by the full name of the student borrower, the social security number of the student borrower, the last date of attendance on record at plaintiff's school, the repayment date and the type of potential servicing error suspected. Other information available to plaintiff is contained in this list where it is relevant to the type of servicing error suspected. Plaintiff provided this list to each guaranty agency in its submission of information.

Plaintiff has further presented evidence to the effect that there exists a serious problem, recognized by DOE, in that the guaranty agencies in various areas of the country, including areas serviced by plaintiff, are failing to ensure that federally insured loans have been properly serviced by the lenders and that the guaranty agencies are also failing to properly perform their own "due diligence" obligations with respect to such loans. The problem stems from the fact that many of the guaranty agencies are affiliated with the lenders. In many instances guaranty agencies are the parent corporations for subsidiary lenders. In other instances, guaranty

agencies and lenders are controlled by common management. In any event, these conflicts of interest create situations where the guaranty agencies have no economic incentive to report lenders who are failing to properly service loans because such a report could affect the guaranty agency's own financial position. *Regarding Fraud, Waste and Abuse in Education Department Programs and Opportunities for Streamlining Departmental Programs: Hearing Before the Subcomm. on Labor, Health and Human Services, and Education of the Senate Comm. on Appropriations* 103th Cong., 1st Sess. (June 18, 1993) (statement of James B. Thomas, Jr., Inspector General of the U.S. Department of Education).

Defendant has presented no evidence which refutes plaintiff's allegations of improper servicing nor has defendant presented any evidence of measures employed by defendant to identify improperly serviced loans. Rather, defendant argues that the information contained in the "tape dump" provided by the guaranty agencies suffices as a means of identifying improperly serviced loans to be excluded from the calculation of CDRs. Defendant's arguments are unconvincing, at least insofar as these arguments are unsupported by the record before this Court at this stage in the proceeding.

■ This Court is persuaded that if, as plaintiff contends, the Secretary has failed to determine whether or not loans have been improperly serviced or collected before calculating the CDR for plaintiff's school, then the Secretary has exceeded the scope of his authority. This conclusion is supported by opinions of numerous other courts which have recently dealt with the same issue. *Atlanta College of Medical and Dental Careers, Inc. v. Riley,* 987 F.2d 821 (D.C.Cir.1993); *International Dealers School, Inc. v. Riley,* CV–S–93–451–LDG (D.Nev. June 2, 1993); *Concorde Career Colleges, Inc. v. Alexander,* No. 92–1064–CV–W–6 (W.D.Mo. December 23, 1992); *CBM Education Center of San Antonio, Inc. v. Alexander,* Adv. No. 92–2012–M (Bankr.S.D.Tex. February 14, 1992).

Further, reliance by the Secretary on the default information provided by the guaranty agencies may be arbitrary and capricious given the economic disincentive for the guaranty agencies to accurately report this information. The defendant's reliance on the guaranty agencies, which is effectively a delegation of duty to a non-governmental entity, raises serious doubts as to whether the Secretary is administering his duties, as set forth in 20 U.S.C. § 1085(m), in a permissible manner.

■ This Court finds that plaintiff has adequately demonstrated on the present record that it is likely that the Secretary has exceeded the scope of his authority. Further, an injunction preventing defendant from publishing the calculated CDRs and mandating that these CDRs be temporarily suspended does not interfere with the internal operations of the Department of Education. Therefore, this Court has jurisdiction to award such injunctive relief if it is further held to be appropriate in these circumstances.

## II. *PRELIMINARY INJUNCTION*

■ Plaintiff seeks an injunction preventing defendant from publishing or continuing to publish the cohort default rates calculated by defendant for plaintiff's school for the fiscal years of 1989, 1990 and 1991 and further mandating the suspension of those rates.

In determining whether to grant or deny preliminary injunctive relief, the court considers the following:

(1) whether the movant will likely succeed on the merits of the litigation;

(2) whether the movant will be irreparably injured if relief is not granted;

(3) the possibility of harm to other interested persons if the injunction is granted or denied; and

(4) the public interest.

*Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 191–92 (3d Cir.1990); *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197–98 (3d Cir.1990).

## A. *Likelihood of Success on the Merits*

■ Plaintiff has presented sufficient unrefuted evidence of likelihood of success on the merits of its claim.

First, as previously discussed, defendant has not presented any evidence which shows that the CDRs for plaintiff's school were calculated without inclusion of improperly serviced loans. To the contrary, the evidence indicates that in all likelihood these calculations did include loans which were improperly serviced. Therefore, it is likely that plaintiff would ultimately succeed on its claim that defendant has failed to exclude improperly serviced loans, as required by 20 U.S.C. § 1085(m)(1)(B).

Second, the testimony of Gary Musselman indicates it is likely that, if properly calculated, the CDR for plaintiff's school for the fiscal year 1991 would be well below the threshold percentage.[8] While defendant vigorously argues in opposition to Mr. Musselman's conclusion, defendant has produced no evidence on the record which refutes that conclusion at this time.

## B. *Irreparable Injury to Plaintiff*

■ Where the result of denying injunctive relief would be the destruction of an ongoing business, such a result generally constitutes irreparable injury. *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,* 875 F.2d 1174, 1178–79 (5th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Specifically, where denial of an injunction would result in a school no longer receiving income provided by student financial aid programs and where such income is necessary to continue operating the school, this would constitute irreparable injury. *Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Ltd. v. Cavazos,* 716 F.Supp. 638, 644 (D.D.C.1989).

■ Plaintiff has demonstrated that publication of the 1991 rate, in conjunction with the previously published 1989 and 1990 rates, will render plaintiff ineligible for continued participation in FFEL. Further, publication of the 1991 rate, in conjunction with the previously published 1989 and 1990 rates, will effectively result in the loss of other types of federal funding which plaintiff currently receives.[9] The loss of other types of federal funding would not be the direct result of an ineligibility determination, but rather would be the indirect result of the stigma associated with high CDRs in that there would be a lack of lenders willing to loan money to plaintiff's students.

Federal loans account for approximately 85% of the tuition payments which plaintiff receives to operate its school. Plaintiff has demonstrated that it will not be able to continue to operate its school beyond the end of this month if it loses federal funding. Still further, unless these rates are suspended and notice of such suspension is published, plaintiff will in all likelihood also lose its accreditation. Thus, unless defendant is enjoined from publishing or continuing to publish the CDRs for 1989, 1990 and 1991, and unless those rates are suspended, the resulting injury to plaintiff in the demise of its school will be irreparable.

## C. *Balance of the Harms*

■ Plaintiff has demonstrated that denial of the injunctive relief sought would result in the loss to plaintiff of federal funding and its accreditation. If such a loss occurs, plaintiff will suffer harm in that it will be unable to continue to operate its school. This type of harm is severe in nature.

The harm to DOE that would result from a grant of the injunction is minimal at best.

---

8. Mr. Musselman stated it was his opinion, based upon his review of the information available to plaintiff, that proper calculation would result in a CDR of approximately 15% for plaintiff's school for the fiscal year 1991. Plaintiff has indicated that its pending administrative appeal before DOE challenges the published CDRs for all three years, 1989, 1990 and 1991, and Mr. Musselman testified that, given adequate time and documentation, he believes plaintiff will demonstrate corrected CDRs below the threshold for all three years.

9. A large portion of the students attending plaintiff's school receive Pell loans which are another type of federally guaranteed student loan. Pell loans are not part of the FFEL programs.

The injunctive relief sought by plaintiff would not interfere with the internal operations of the Department of Education. Defendant alleges that harm will ensue if injunctive relief is granted because of the danger of additional economic and social costs associated with high default schools.

Plaintiff stands to suffer severe harm, which is specific in nature, if injunctive relief is denied. Defendant stands to potentially suffer a very general sort of harm if this injunction is granted. Thus, it is clear that the balance of the respective harms weighs in plaintiff's favor.

### D. *Public Interest*

█ The operation of plaintiff's school benefits the public by providing quality education to persons who are below the poverty level prior to enrolling at plaintiff's school. Many of the students at plaintiff's school are on welfare and are an economic burden to society at the time of initial enrollment. Plaintiff's school provides a service to society by educating these persons and by supplying them with the means to be self-sufficient. The education provided by plaintiff's school allows a large number of impoverished persons to become productive, contributing members of society. Granting plaintiff injunctive relief will allow it's school to remain operational and would therefore serve the public interest.

### E. *Bond Requirement*

█ This Court has considered the necessity of requiring plaintiff to post a security bond as provided in Fed.R.Civ.P. 65(c) and finds, in its discretion, that it is appropriate to dispense with such a requirement. *Temple University v. White*, 941 F.2d 201, 219–20 (3d Cir.1991); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987); *California ex rel. Van de*

*Camp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir.1985).

### III. *DISCOVERY*

Plaintiff must be able to effectively present its administrative appeal if it is to succeed on the merits of its claim. Plaintiff cannot do this unless it is given the opportunity to review the servicing records for those loans which may have been erroneously included in the calculation of its CDR. Plaintiff has submitted to the guaranty agencies a compilation of information regarding those disputed loans known to plaintiff. But, in this regard, the guaranty agencies have consistently denied plaintiff access to the identified loan records on the basis that plaintiff has failed to present *loan specific* evidence. (Evid. Hr'g held September, 1993, Pl.'s Ex. 4: letters to plaintiff from Nebraska Student Loan Program, Inc., USA Services, California Student Aid Commission, and Pennsylvania Higher Education Assistance Agency).

A school must compile and submit information to the guaranty agencies regarding disputed loans within ten days from the date it receives notification from DOE of its calculated CDR in order to comply with the procedures set forth in the May, 1993 DCL. The testimony of Mr. Musselman indicates that since a school does not have access to the actual loan files of its students,[10] the school is limited as to the specificity of information it can submit to the guaranty agencies regarding disputed loans. The school must make use of the information available to it and, in this regard it can only provide "loan specific" evidence to the best of its ability. Further, any inability to adequately detail errors associated with a disputed loan in the form of "loan specific" evidence is only made worse by the fact that the school is working under a ten day time constraint in putting together this information.[11]

Other courts have addressed the issues confronted by this Court. In *Atlanta College of Medical and Dental Careers, Inc. v. Riley*, 987 F.2d 821 (D.C.Cir.1993), the Court of Appeals for the D.C. Circuit affirmed two

---

10. The guaranty agencies possess the actual loan files.

11. Mr. Musselman testified that requiring a school to compile the necessary information for submission to the guaranty agencies within ten days is extreme and overly demanding. Mr. Musselman stated that this ten day time constraint essentially required plaintiff to ignore all other facets of its business for ten days in order to focus on compiling this information.

district court decisions. The first district court decision, *Atlanta College*, 792 F.Supp. 114 (D.D.C.1992), found the actions of the Secretary to be arbitrary and capricious in making the success of an appeal (based on alleged servicing and collection errors) dependent upon the school's producing information to which it has no access. The second district court decision, *Wilfred American Educational Corp. v. Alexander*, No. 92–1384, 1992 WL 464232 (D.D.C. July 7, 1992), which relied in part upon the district court holding in *Atlanta College*, enjoined the Secretary from implementing his ineligibility determinations.

The Secretary of the Department of Education argued on appeal in *Atlanta College* that 20 U.S.C. § 1085 does not provide for "improper servicing or collection" as a defense to an ineligibility determination based on the Secretary's calculated CDR for the school. The Court of Appeals rejected the Secretary's argument and held that the unambiguous meaning of the statute does provide for this defense when a school appeals the Secretary's calculation as being inaccurate. The Court of Appeals did not attempt to "delineate precisely what [the language of 20 U.S.C. § 1085(m)(1)(B) ] means or how the Secretary *must* administer appeals relying on that directive," however, the court did specifically "find ... that the Secretary *may not* administer the appeals process in a way that requires schools to proffer information that they cannot obtain in order to maintain a successful appeal, whether that appeal is based on improper servicing or not." (emphasis added) *Atlanta College*, 987 F.2d at 829.

The plaintiff in *Atlanta College* has subsequently been permitted to conduct discovery pursuant to Fed.R.Civ.P. 26. Judge Louis F. Oberdorfer, on remand from the Court of Appeals, issued the order permitting plaintiff to conduct discovery, and in that order he specifically found that "the appeals process defined by the defendant's so-called 'Dear Colleague' letter [was unlikely to] provide plaintiff with information in the exclusive possession of the guaranty agency which plaintiff requires to maintain a successful appeal." Order dated July 6, 1993 at 1.

Judge Oberdorfer cited *International Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920 (D.C.Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), as authority for issuing that order. *International Ladies' Garment Workers* held that a district court has the power and the obligation to enforce the mandate of a higher court. The mandate set forth by the Court of Appeals in *Atlanta College* directed that the Secretary could not administer the appeals process in a way that requires schools to proffer information they cannot obtain. Judge Oberdorfer's order allowing for discovery was meant to afford the plaintiff an early opportunity to establish its entitlement to an order compelling defendant to comply with the mandate of the Court of Appeals.

It is clear that the appeals process currently followed by the Secretary requires plaintiff to proffer information to the Secretary which plaintiff has thus far been prevented from obtaining. This was the problem addressed by the Court of Appeals in *Atlanta College* and by Judge Oberdorfer in his subsequent order.

■ In situations where an administrative procedure is shown to be inadequate to prevent irreparable injury, it is not necessary to await a final agency decision before a federal district court may permit discovery of necessary documents so as to prevent irreparable injury pending the completion of the administrative process. *Barnes v. Chatterton*, 515 F.2d 916 (3d Cir.1975); *R.H. Macy & Co. v. Tinley*, 249 F.Supp. 778 (D.D.C. 1966).

■ This Court accordingly concludes that plaintiff should be permitted to obtain discovery of the information it needs to effectively proceed with its administrative appeal. Therefore, this Court retains jurisdiction over this matter for the purpose of providing plaintiff with the opportunity to use federal discovery procedures to obtain the needed, relevant information.

An Order accompanies this opinion.

### ORDER

This matter having come before the court on plaintiff's application for a preliminary

**1108**

injunction seeking (a) to prevent defendant, Richard W. Riley, in his official capacity as Secretary of the United States Department of Education, from publishing or continuing to publish certain cohort default rates which plaintiff alleges have been erroneously calculated by defendant; (b) to mandate defendant to suspend these rates and publish appropriate notice of such suspension; and (c) for any other relief which the court deems just and proper; and, on defendant's motion to dismiss for lack of subject matter jurisdiction; and the court having reviewed the submissions of the parties and the parties having presented testimony at the hearing held on this matter, and for good cause shown, as more particularly set forth in the accompanying opinion;

IT IS on this 14th day of October, 1993 ORDERED that plaintiff's request for a preliminary injunction is hereby GRANTED: and, it is ORDERED that defendant, Richard W. Riley, in his official capacity as Secretary of the United States Department of Education, is enjoined from publishing or continuing to publish the cohort default rates calculated by defendant for plaintiff's school for the fiscal years of 1989, 1990 and 1991; and that defendant shall suspend each of these cohort default rates and shall immediately publish official notice of such suspension; and that plaintiff is not required to post a bond;

IT IS FURTHER ORDERED that this injunction shall remain in effect until the completion of plaintiff's pending administrative appeal before the Department of Education and any subsequent judicial appeal proceedings, or until further order of this Court;

IT IS FURTHER ORDERED that plaintiff be permitted to obtain discovery of the information it needs to effectively proceed with its administrative appeal; and

IT IS FURTHER ORDERED that defendant's motion to dismiss is hereby DENIED.