987 F.2d 821
 300 U.S.App.D.C. 157, 81 Ed. Law Rep. 721
 ATLANTA COLLEGE OF MEDICAL AND DENTAL CAREERS, INC., et al., Appellee,
v.
Richard W. RILEY, Secretary of Education, in his Official
Capacity, Appellant.
WILFRED AMERICAN EDUCATIONAL CORPORATION, doing business as
Wilfred Academy of Hair and Beauty Culture,
Plaintiff-Appellee,
v.
Richard W. RILEY, Secretary of Education, in his Official
Capacity, Defendant-Appellant.
 Nos. 92-5251, 92-5291.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 16, 1992.
Decided March 12, 1993.
 
 [300 U.S.App.D.C. 158] Appeal from the United States District Court for the District of Columbia.
 Robert L. Shapiro, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Richard Wyner, Deputy General Counsel and Brian P. Siegel, Attorney, U.S. Dept. of Educ., Washington, DC, were on the brief for the Secretary of Educ.
 [300 U.S.App.D.C. 159] Jonathan B. Hill, with whom Michael B. Goldstein, Blain B. Butner, and Karen A. Post, Washington, DC, were on the brief, for appellees Atlanta College of Medical and Dental Careers, Inc., and Louisville College of Medical and Dental Careers, Inc.
 Robert B. Funkhouser, New York City, with whom John M. Townsend and William R. Stein, Washington, DC, were on the brief, for Wilfred American Educational Corp.
 Ian D. Volner and N. Frank Wiggins, Washington, DC, entered an appearance for amicus curiae Career College Ass'n.
 Before WALD, SILBERMAN and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Opinion concurring in the judgment filed by Circuit Judge D.H. GINSBURG.
 WALD, Circuit Judge:
 
 
 1
 In this consolidated appeal, the Secretary of Education ("Secretary") seeks reversal of two district court decisions. Both decisions relate to the Secretary's handling of administrative appeals brought by post-secondary schools seeking to maintain their eligibility to participate in federal student loan programs. In Atlanta College of Medical & Dental Careers, Inc. v. Alexander, 792 F.Supp. 114 (D.D.C.1992), the flagship appeal, the district court vacated the Secretary's determination that two post-secondary schools were no longer eligible to participate in the loan programs. The court found that the Secretary had acted arbitrarily and capriciously, and in violation of the Administrative Procedure Act, by making a successful appeal of the initial ineligibility determination dependent upon producing information to which the schools had no access. In Wilfred American Educational Corp v. Alexander, No. 92-1384, 1992 WL 464232 (D.D.C. July 7, 1992), the district court, relying on Atlanta College, preliminarily enjoined the Secretary from implementing his ineligibility determinations in the case of two other schools. We affirm both decisions.
 
 I.
 A. Statutory and Regulatory Framework
 
 2
 Under the Federal Family Education Loan ("FFEL") program (formerly known as the Guaranteed Student Loan program), post-secondary students obtain loans from private lenders to pay for tuition, fees, and living expenses at eligible educational institutions. See 34 C.F.R. § 682.100-.101. Guaranty agencies--private nonprofit or state-run organizations--insure repayment of these loans. See 20 U.S.C. § 1078(b)-(c). The Department of Education ("DOE"), in turn, provides reinsurance to the guaranty agencies. See 20 U.S.C. § 1078(c); 34 C.F.R. § 682.404.
 
 
 3
 The loan guaranty program works as follows: For Stafford Loans,[1] a student generally begins paying interest, principal, or both on a loan after a six month grace period running from the last date of full- or half-time attendance at a post-secondary institution. See 20 U.S.C. § 1078(b)(1)(E); 34 C.F.R. § 682.209(a)(2)(ii). If a student is delinquent in repaying her loan, DOE regulations require lenders to engage in due diligence or "servicing" activities--pressuring the borrower for repayment--for a 180 day period starting from the later of (1) the day after the borrower misses a payment or (2) 30 days after the borrower enters the repayment period. See 34 C.F.R. § 682.411(a)-(f). If the borrower does not update overdue payments within the 180 days, the loan goes into default, and the lender submits a claim to the guaranty agency. See 34 C.F.R. § 682.411(f). The guaranty agency then reviews the lender's records to assure that the lender has met its servicing obligations before paying the claim. See 34 C.F.R. § 682.406(a)(1) (conditioning payment from DOE to the guaranty agency on the lender's fulfillment of due diligence obligations). If the guaranty agency pays [300 U.S.App.D.C. 160] the claim, it must embark upon its own collection or servicing activities. See 34 C.F.R. § 682.410(b)(4). Should those efforts fail, the guaranty agency may seek reimbursement from DOE.
 
 
 4
 Because, under this scheme, DOE was forced to ante up increasing amounts of money on defaulted loans, Congress passed the Student Loan Default Prevention Initiative Act ("SLDPIA") in 1990. That law sought to reduce the cost of the FFEL program by promptly eliminating from the program schools whose students had chronically high rates of default. The SLDPIA amended the Higher Education Act ("HEA"), 20 U.S.C. § 1070 et seq., so that a school loses its eligibility of its "cohort default rate" ("CDR") for each of the three most recent fiscal years for which data are available exceeds a certain percentage. See 20 U.S.C. § 1085(a)(3)(A).[2] A school's CDR for any fiscal year is essentially the percentage of current and former students entering the repayment period during that fiscal year who default by the end of the next fiscal year. See 20 U.S.C. § 1085(m)(1)(A).[3] The Secretary gets the information necessary to calculate this percentage from the "tape dump," a collection of student loan data provided by the guaranty agencies. The statute also requires that the Secretary, in making the CDR calculation, "shall ... exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate." 20 U.S.C. § 1085(m)(1)(B).
 
 
 5
 When the Secretary determines that a school's CDR is above the statutory percentage, the school may appeal the Secretary's decision on only two grounds: the school can attempt to "demonstrate[ ] to the satisfaction of the Secretary that the Secretary's calculation of its cohort default rate is not accurate, and that recalculation would reduce its cohort default rate for any of the three fiscal years below the threshold percentage" or the school can endeavor to show "exceptional mitigating circumstances" that would make its loss of eligibility "inequitable." 20 U.S.C. § 1085(a)(3)(A)(i)-(ii).[4] If, as in these cases, a school desires to appeal on the first ground, i.e., the inaccuracy of the calculation, it must, within 30 days of notification of ineligibility, submit specific relevant data to the guaranty agencies. See 20 U.S.C. § 1085(a)(3)(A); 56 FED.REG. 33332, 33336-7 (1991); id. at 33340 (to be codified at 34 C.F.R. § 668.15(g)(3)). After the guaranty agencies respond, the school must forward the entire package of information to the Secretary, who has 45 days in which to decide the appeal. See 20 U.S.C. § 1085(a)(3)(A); 56 FED.REG. at 33340 (to be codified at 34 C.F.R. § 668.15(g)(4)).
 
 B. Facts of Phillips Appeal
 
 6
 On July 15, 1991, DOE notified Atlanta College of Medical and Dental Careers and Louisville College of Medical and Dental Careers (collectively, the "Phillips schools"), that their CDRs exceeded the 35% statutory threshold for fiscal years [300 U.S.App.D.C. 161] 1987, 1988, and 1989, and that, accordingly, they were ineligible to participate further in the FFEL program. The Phillips schools' rates exceeded the statutory benchmark by less than 1%--Atlanta College's 1987 rate was 35.0% and Louisville College's 1988 rate was 35.7%. Accordingly, both schools appealed, claiming that the Secretary's calculation of their CDRs was inaccurate. Because § 1085(m)(1)(B) requires that the Secretary exclude any loans from the CDR which "due to improper servicing or calculation, would result in an inaccurate or incomplete calculation," the Phillips schools sent off a series of letters to DOE asking how they could demonstrate in their appeals that loans should have been excluded on the basis of improper servicing. Those letters went unanswered.
 
 
 7
 The Phillips schools also retained the accounting firm of Coopers & Lybrand ("Coopers") to aid their appeal. From the schools' own records, Coopers determined each student's last date of attendance and, by adding the six month grace period required for Stafford loans, computed the date on which the student's loan presumably would have entered repayment. Coopers then compared each of those projected dates of repayment with the date listed in the tape dump data relied on by DOE. Using this methodology, Coopers reported hundreds of suspected errors in DOE's information on the Phillips schools' students. These errors were of several types. "Error 1" cases were student accounts for which the repayment date as computed by Coopers fell in a different fiscal year than the one listed in the tape dump (if the tape dump put the repayment date in the wrong fiscal year, DOE would have placed the loan in the wrong cohort default period). "Error 2" and "Error 3" cases were student accounts that Coopers had reason to believe received grace periods either shorter or longer than the prescribed period, i.e., where the time between the student's last date of attendance listed in the school's records and the repayment date listed in the tape dump was either more or less than six months. The Phillips schools asserted that lenders' use of incorrect grace periods constituted improper servicing causing defaults and that, under § 1085(m), those loans should be excluded from the schools' CDRs.[5]
 
 
 8
 In accordance with DOE regulations, the schools sent the information compiled by Coopers to the guaranty agencies for "verification." The guaranty agencies confirmed a few errors, rejected the rest largely without explanation, and recommended that the schools take up any remaining issues with DOE. The Phillips schools then submitted the guaranty agencies' responses, along with the Coopers report, to DOE. On January 3, 1992, DOE responded that each school's appeal was denied "[b]ased on the information confirmed by the guarantee agency or agencies" and that the school was no longer eligible to participate in the FFEL program. DOE's responses indicated that it accepted only the few errors confirmed by the guaranty agencies; all other allegations were denied without any specific explanation.
 
 
 9
 Dissatisfied with DOE's responses, the Phillips schools filed suit in district court asserting that DOE had violated the Administrative Procedure Act in eliminating them from the FFEL program. After the district court opined that the January 3 letters provided scant explanation for DOE's actions, DOE issued supplemental letters on March 4, 1992. Those letters explained that DOE rejected the Phillips schools' allegations en masse because the methodology employed in the Coopers report was "fundamentally flawed." According to DOE, Coopers' technique of calculating the date a loan entered repayment by adding six months to the student's last date of attendance at the Phillips schools did not control for other factors that might affect the repayment date. Specifically, DOE argued that (1) a student may have received a deferment of repayment because she entered [300 U.S.App.D.C. 162] another school during the six month grace period; (2) the lender may have used month-specific, and not day-specific, repayment calculations; or (3) the school may not have notified the lender that the student had left school, resulting in the repayment date being calculated from the projected date of graduation, rather than the actual last date of attendance. Information about such factors, DOE claimed, "is essential to the proper determination of a student's 'date entered repayment' ... but is not reflected in the school files used by and referred to by [Coopers] and your school in your appeal."
 
 
 10
 On June 7, 1992, the district court vacated DOE's decisions and remanded the case to DOE. The court first found that the agency did not provide sufficient explanation for its decision to expel the Phillips schools from the program and that the explanation it did provide indicated that DOE had simply accepted the findings of the guaranty agencies, and had not engaged in any independent review of the whole record. Further, DOE's March 4 supplemental decision letters rendered the appeal procedure arbitrary and capricious by relying on hypothetical considerations that might make the Coopers results inaccurate. These additional considerations placed the schools in a "catch-22" situation: the schools did not have the necessary material in their own records to exclude the hypothetical possibilities and so could not possibly rebut DOE's presumptive reliance on the guaranty agency data about student accounts.
 
 C. Facts of Wilfred Appeal
 
 11
 In June 1991, the Secretary notified the Wilfred Academy of Hair and Beauty Culture in Manhattan and the Wilfred Academy of Hair and Beauty Culture in the Bronx (collectively, the "Wilfred schools"), that they would no longer be eligible to participate in the FFEL program because their CDRs exceeded the 35% statutory threshold. Both schools appealed their termination on the ground that the Secretary had inaccurately calculated the schools' CDRs. Like the Phillips schools, the Wilfred schools based their appeals in part on the Secretary's failure to exclude loans that defaulted due to "improper servicing" by lenders. But, unlike the Phillips schools' Error 2 and Error 3 claims alleging improper grace periods, the Wilfred schools sought directly to contest the lender's performance of its due diligence obligation to call and write borrowers during the 180 day period after the loan became delinquent. While the Phillips schools' servicing claims based on grace periods could be pursued by comparing the tape dump data with school data, the Wilfred schools' servicing claims could only be pursued through direct access to the lender's servicing records, which are in the possession of the guaranty agencies.
 
 
 12
 Accordingly, to back their claim, the Wilfred schools were forced to request servicing information from the guaranty agencies. They did just that, and also wrote letters to DOE seeking help in obtaining the necessary material. The guaranty agencies refused to provide the data, and DOE never responded to the Wilfred schools' inquiries. The schools also compiled information on other alleged calculation inaccuracies (specifically, that some additional loans should have been included in the 1988 CDR calculation), which they submitted first to the guaranty agencies and ultimately to the Secretary. Although the Secretary accepted some of these allegations--resulting in the Manhattan school's 1988 CDR being reduced to 35.0%--he ultimately denied both schools' appeals without addressing their request for the loan servicing data.
 
 
 13
 Wilfred then filed suit in the district court. That court, agreeing with the Atlanta court that DOE arbitrarily required the schools to produce loan servicing data that was not available to them, granted Wilfred's request for a preliminary injunction.[6][300 U.S.App.D.C. 163] II.
 
 
 14
 A. The Secretary's Interpretation of the Statute
 
 
 15
 The Secretary appeals both district court decisions. His primary contention on appeal is that, in both cases, the district court proceeded from the false premise that "improper servicing" is a defense to an ineligibility determination based on a school's CDR.[7] According to the Secretary, he need not, and in fact does not, recognize such a defense, and thus he has done nothing improper in disposing of the schools' servicing claims without allowing the schools access to information necessary to make out the "phantom" servicing defense.[8] In making this argument, the Secretary stresses that the statute explicitly requires only that schools be able to contest their loss of FFEL program eligibility on the grounds that the "Secretary's calculation of [the] cohort default rate is not accurate" or that "exceptional mitigating circumstances" would make ineligibility inequitable. 20 U.S.C. § 1085(a)(3)(A)(i)-(ii). According to the Secretary, since "improper servicing" is not among the explicitly enumerated defenses to ineligibility, we must defer to his reasonable conclusion that the HEA, a statute whose enforcement Congress has delegated to his agency, does not include such a defense. More specifically, he argues that it is at best ambiguous whether an appeal based on the Secretary's inaccurate "calculation" under § 1085(a)(3)(A)(i) is meant to encompass servicing complaints. As a result, the Secretary contends, we must accept as reasonable his reading of the term "calculation" as only encompassing appeals based on inaccuracies in the tape dump data and not appeals based on alleged servicing errors.[9] Additionally, while the Secretary acknowledges that the statute says that "the Secretary shall ... in calculating the cohort default rate, exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate," 20 U.S.C. § 1085(m)(1)(B), he insists that he need not implement that command through allowance of appeals based on improper servicing. Rather, he asserts, he may satisfy the statute's mandate through rigorous "front end" prophylactic procedures such as auditing lenders and requiring them to certify that they have met servicing requirements.
 
 
 16
 In assessing the Secretary's argument, we must of course follow the analytic framework announced by the Supreme Court in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Following that well-trodden path, we first determine if the statute's text speaks directly to the question at hand; "[i]f the statute is clear and unambiguous, 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " Board of Governors of the Federal Reserve System v. Dimension Financial Corp., 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986) (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781); see also Public Employees Retirement System v. Betts, 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of [300 U.S.App.D.C. 164] the statute itself."). Only if we find that the statute is silent or ambiguous as to the issue presented do we consider whether the agency's construction is reasonable. See, e.g., Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 
 17
 In this case, we find that the statute's text forecloses the Secretary's contention that improper servicing arguments can be walled off completely from the appeals process, and so we accord no deference to his interpretation.[10] The statute plainly contemplates appeals arguing that the "Secretary's calculation of [the] cohort default rate is not accurate." 20 U.S.C. § 1085(a)(3)(A)(i). And, in defining a cohort default rate, the statute specifically states: "[T]he Secretary shall ... in calculating the cohort default rate, exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate." 20 U.S.C. § 1085(m)(1)(B) (emphasis added). Reading these provisions in tandem, two things seem indisputable. First, a school must be able to allege in an appeal that the Secretary's CDR "calculation" is "not accurate." Second, the Secretary, in calculating the CDR, is required to exclude loans that "due to improper servicing or collection" would render the calculation "inaccurate" or "incomplete." Putting these two givens together, it becomes clear that the Secretary must entertain appeals alleging that he has failed to exclude from his calculation of the CDR loans that due to improper servicing make that calculation inaccurate.[11] In this regard, § 1085(m) reflects a not surprising congressional recognition that the actions of lenders--a group that because of the presence of the indirect federal guaranty has no direct economic incentive to engage in thorough servicing--may have a critical impact upon the accuracy of the Secretary's calculation of student default rates. That recognition, coupled with Congress' earlier decision to allow appeals asserting inaccurate calculations, necessarily sanctions the type of administrative appeal the appellee schools seek to bring here. Put another way, when the statute declares that the handling of a particular part of the calculation may affect the accuracy of the calculation, the Secretary may not exclude consideration of that factor from an appeal that, under the provisions of the same statute, may be based on [300 U.S.App.D.C. 165] the alleged inaccuracy of the calculation.[12]
 
 
 18
 The Secretary's alternative interpretation of the statute ignores key elements of its text. In asserting that the word "calculation" in § 1085(a)(3) is ambiguous and may reasonably be interpreted only to allow appeals based on tape dump inaccuracies, the Secretary overlooks the fact that the statute explicitly makes it part of the Secretary's calculation chore to exclude loans that "due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate." Under § 1085(m), the Secretary is directed to exclude such loans "in calculating the cohort default rate." Thus, whether or not the term "calculation" is ambiguous in any other respect, under § 1085(m), that term must encompass the task of excluding loans that as a result of improper servicing would "result in an inaccurate or incomplete calculation of the cohort default rate." Similarly, in arguing that the Secretary's statutory duty to exclude such loans is satisfied by his "front end" procedures, the Secretary does not come to terms with the same statutory command: notwithstanding any other procedures he undertakes to assure the lenders' fulfillment of their servicing obligations, § 1085(m) requires the Secretary to exclude loans that defaulted due to improper servicing "in calculating the cohort default rate" at the "back end" of the process.
 
 B. The Secretary's Administrative Concerns
 
 19
 We decide only that schools must be allowed to argue in an appeal that the Secretary's CDR calculation is inaccurate because the Secretary failed to "exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate." 20 U.S.C. § 1085(m)(1)(B). We do not, however, attempt to delineate precisely what that quoted phrase means or how the Secretary must administer appeals relying on that directive.[13] We stress this point because the Secretary argues that litigation on the servicing of each loan at issue would result in time-consuming investigations by guaranty agencies and schools and complex and burdensome evaluations by DOE. We sympathize with the Secretary's distaste for such a prospect. Moreover, and more importantly, the short [300 U.S.App.D.C. 166] time period provided by the statute for the disposition of these appeals--30 days for the schools to complete their appeal and 45 days for the Secretary to rule on a complete appeal--may indeed indicate that Congress, in enacting the SLDPIA, was also concerned with expedited processing of schools' claims.
 
 
 20
 But the Secretary's understandable concerns along these lines cannot trump a clear statutory injunction. And, in any case, we do not think our decision is at loggerheads with the Secretary's desire for expeditious decertification of schools that truly have impermissibly high CDRs. The Secretary can avail himself of many options in processing appeals based on "improper servicing." For example, under the statute, not all improperly serviced loans are to be excluded from the CDR calculation; rather, only loans that "due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate" need be excluded. This causal connection could be difficult to demonstrate: How does a school show that an added phone call or a month tacked on to a grace period would have prevented a loan's default? And must the school show "but for" causation, proximate causation or merely some reasonable causal link? The statute itself provides no answers to these riddles; accordingly, under Chevron 's second step, we would defer to any reasonable interpretation of the "due to" language that the Secretary proffered. See also Jerry Mashaw, A Comment on Causation, Law Reform, and Guerrilla Warfare, 73 GEO.L.REV. 1393, 1396 (1985) (identifying the "cause" of something necessarily implicates a policy choice). And, under the circumstances, it would seem quite reasonable for the Secretary to adopt regulations or even adjudicatory presumptions--bright-line rules--as to what a school must show to demonstrate that the calculation is inaccurate "due to" improper servicing. See American Hospital Association v. NLRB, --- U.S. ----, ----, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991) (prior Supreme Court decisions "confirm that, even if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability" unless Congress expressly withholds that authority); Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983) (same); New England Coalition on Nuclear Pollution v. NRC, 727 F.2d 1127, 1129 (D.C.Cir.1984) (Scalia, J.) (even where statutory mandate requires an agency to consider a specific issue, that "does not preclude the adoption of appropriate generalized criteria that would render some case-by-case evaluations unnecessary").
 
 
 21
 Such a course may alleviate some of the litigation burden that the Secretary fears. If it does not go far enough, the Secretary may be forced to petition Congress for authority to create a more manageable system.
 
 III.
 
 22
 The Secretary raises an additional argument relevant only to the Atlanta College appeal. He alleges that the district court, in requiring the Secretary to rebut the allegations in the Coopers report, improperly flipped the statutory burden of proof. We are unpersuaded. While the Secretary is correct in noting that the schools have the burden of demonstrating errors in the CDR calculation "to the satisfaction of the Secretary," 20 U.S.C. § 1085(a)(3)(A)(i), the district court's decision did not contravene that provision.
 
 
 23
 The district court found that the Secretary could not deny a claim on the ground that the schools had not excluded possible scenarios that could affect the accuracy of the schools' submissions when those scenarios could only be eliminated with information unavailable to the schools. We believe the district court was correct in this conclusion. The statutorily granted right to appeal would be meaningless if the Secretary could reject for "hypothetical" reasons a school's showing of a mistaken calculation backed up by all the information to which the schools had access. See 792 F.Supp. at 122 ("By requiring the schools to produce data that is not available to them before it will even consider errors [300 U.S.App.D.C. 167] alleged by them, the Department has transformed its initial reliance on the guarantee agencies' data into an irrebuttable presumption, and has therefore rendered the appeals process ... arbitrary and capricious."); see also id. at 119 & n. 11 (with the exception of information related to student attendance in another institution before expiration of the grace period, DOE does not deny that schools have used all information available to them); Affidavit of Marilyn Coleman, Student Loan Officer for Phillips Colleges, Inc., at p 3 (guaranty agencies and DOE will not share relevant information with Phillips); DOE Brief at 33 ("[School] records have no official status in regard to students' [loans] and ... have little relevance to the issue of whether the borrower is or is not in default during a particular period of time."); Reply Brief at 10 (asserting that more important than the specific inadequacies in the schools' documentation is the fact that the schools' data is "irrelevant" because it is the lender's data that is official).[14] While the Secretary remains free to be terse and informal in his response to the schools, see, e.g., Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam ), the schools have "gone about as far as they can go" when they present specific allegations supported by all the information available to them and when that information is sufficient, if undisputed, to require the Secretary to reverse his eligibility determination. See Geddes v. Benefits Review Bd., 735 F.2d 1412, 1418 (D.C.Cir.1984) (burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue). Of course, such a requirement does not place the ultimate burden of proof on the Secretary; rather, it places a burden on him only to produce countervailing evidence or a reason, not based on the insufficiency of the school's showing, that explains why the school's allegations have not been accepted. Cf. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981) (while intermediate evidentiary burdens under Title VII shift, the ultimate burden of persuading the trier of fact remains at all times with the plaintiff). Such a requirement is minimally necessary to assure that the statutory promise of an appeal is not broken in practice.[15]
 
 CONCLUSION
 
 24
 The plain language of the statute bars DOE's contention that it need not consider loan servicing arguments in its appeals process. Additionally, the Secretary may not reject an appeal on a basis that would render the appeals process a nullity. Thus, he may not reject without justification an allegation which if proven true would sustain a school's eligibility claim and which is supported by all the evidence within a school's access. Accordingly, the Atlanta court's judgment is affirmed. Also, because [300 U.S.App.D.C. 168] we reject the Secretary's lone objection to the preliminary injunction in the Wilfred case--the assertion that the statute does not mandate an improper servicing defense--that injunction is affirmed and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 25
 It is so ordered.
 
 D.H. GINSBURG, Circuit Judge, concurring:
 
 26
 I concur in the judgment of the court. Because the Congress did not in the Higher Education Act speak unambiguously to the precise question here at issue, and because the construction of the Act now advanced by the Department of Education is an afterthought and hence cannot support an administrative decision based upon another ground, the judgment of the district court must be affirmed. For the same reasons, however, we need not and should not purport authoritatively to construe the Act today.
 
 
 27
 The Department argues to this court that a school may not challenge its disqualification from the Federal Family Education Loan program on the ground that its student loan default rate has been miscalculated due to errors made by lenders in servicing the loans. As the court notes, however, there is "scant evidence that the Secretary or responsible policymakers at DOE--rather than the attorneys who have litigated this case--subscribe to this reading of the statutory language." Ct.Op. at 828 n. 10. Indeed, the scant evidence is all contra.
 
 
 28
 In his decision letters to the schools the Secretary clearly proceeded from the premise that improper servicing is indeed a permissible ground for appeal. For example, in a decision letter written to Phillips College even after the commencement of this litigation the Secretary said that the study that the College had submitted in order to substantiate its claim that its default rate was fatally high only because of servicing errors was "fundamentally flawed" in its methodology and therefore did "not support [the] school's claim of improper servicing." [JA 358]. In that letter the Secretary also noted that the Department did "not have any information indicating that the guarantee agencies mentioned in [the school's] appeal have paid default claims on loans to [its] students that were not serviced in accordance with the regulatory requirements." Clearly the Secretary believed that such information would be relevant to his ruling upon the school's claim. That position is flatly inconsistent, however, with the argument that the Department's counsel now advances to this court, viz. that improper servicing is not a permissible ground for appeal.
 
 
 29
 Of course, were we able to determine under Chevron Step I that the Congress specifically intended in the Act to bar servicing errors as a ground for appeal, then the Department's inconstancy would be of no moment. An agency order compelled by the one true reading of a statute cannot be arbitrary and capricious. See H. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 DUKE L.J. 199, 210 (1969). The Act is not unambiguous, however, as is shown in the opinion of the court, above at page 828, note 10.
 
 
 30
 The Department now urges us to uphold the Secretary's action under Chevron Step II upon the basis of an interpretation of the Act clearly not contemplated by the Secretary. In this circumstance, we do well to recall what Judge Silberman noted elsewhere: "Courts have rejected as inadequate agency counsel's articulation of a statutory interpretation when that interpretation has been inconsistent with a prior administrative construction ... [; or] when the record evidence before the court demonstrates no link between counsel's interpretation and administrative practice ...; or when agency counsel's interpretation is revealed as no more than a 'current litigating position.' " Church of Scientology of Cal. v. I.R.S., 792 F.2d 153, 165 (D.C.Cir.1986) (Silberman, J. concurring) (citations omitted). The first two conditions clearly obtain here and the third may as well.
 
 
 31
 Because the Secretary did not rely upon the interpretation of the Act now being [300 U.S.App.D.C. 169] advanced, counsel's new interpretation cannot ward off the claim that the Secretary's action was arbitrary and capricious. "[A]n order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. 80, 88, 95, 63 S.Ct. 454, 459-60, 462, 87 L.Ed. 626 (1943).
 
 
 32
 For the foregoing reasons, we cannot sustain the Secretary's appeal from the decisions of the district court. I therefore concur in my colleagues' determination that those decisions must be affirmed, and express no opinion, because it is unnecessary to do so in order to decide this case, upon the question whether improper servicing is a valid ground of objection to a school's exclusion from the FFEL program. The Department's lawyers advance a serious argument that, having imposed prophylactic measures upon the lenders and guarantee agencies, the Secretary may, in calculating the cohort default rate, rely upon the data they produce. If that is indeed the Secretary's position, then he should be free to adhere to that position first in some future administrative proceeding and to defend it in court, unhampered by a premature decision to the contrary.
 
 
 33
 The FFEL includes the Stafford Loan program, the Supplemental Loans for Students ("SLS") program, the PLUS Loan program, and the Federal Consolidated Loan program. Only the grace period for the Stafford program is relevant here.
 
 
 
 [2]
 That threshold was 35% for the years relevant to these appeals, but shrinks to 30% for default rate calculations made in 1993 and 25% thereafter. See 20 U.S.C. § 1085(a)(3)(B); Higher Education Amendments of 1992, Pub.L. No. 102-325, 106 Stat. 448, 549 (1992)
 
 
 [3]
 Section 1085(m) (as reorganized by the Higher Education Amendments of 1992, Pub.L. No. 102-325, 106 Stat. 448, 550 (1992)) states in pertinent part:
 (1) IN GENERAL--(A) ... [T]he term "cohort default rate" means, for any fiscal year in which 30 or more current and former students at the institution enter repayment on loans under section 428 or 428(A) received for attendance at the institution, the percentage of those current and former students who enter repayment on such loans received for attendance at that institution in that fiscal year who default before the end of the following fiscal year.
 (B) In determining the number of students who default before the end of such fiscal year, the Secretary shall include only loans for which the Secretary or a guaranty agency has paid claims for insurance, and, in calculating the cohort default rate, exclude any loans which, due to improper servicing or collection, would result in an inaccurate or incomplete calculation of the cohort default rate.
 
 
 [4]
 The Secretary has defined by regulation what constitutes "exceptional mitigating circumstances." See 56 FED.REG. 33332, 33339-40 (1991) (to be codified at 34 C.F.R. § 668.15(g)(1)(ii)-(iii))
 
 
 [5]
 Their causation theory was that if a student is given too short a grace period, she may not have obtained work yet, and thus could not begin repayment and, conversely, that if a student is given too long a grace period, the lender may lose track of her whereabouts, and thus would be unable to exert the necessary pressure for repayment. See Atlanta College Brief at 7
 
 
 [6]
 In the Wilfred case, in contrast to the Atlanta decision, the court found that DOE had engaged in an independent review of default rate data not related to servicing, and thus, at least in that regard, avoided any problem of irrebuttable reliance on guaranty agency data to which the schools had no access
 
 
 [7]
 The government's contests the Wilfred court's injunction solely on the basis of this legal claim; it does not challenge the district court's determination as to any of the other factors relevant to granting injunctive relief. See, e.g., Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-74 (D.C.Cir.1985) (listing the relevant considerations)
 
 
 [8]
 Even if the Secretary were correct that the statute does not require him to consider an improper servicing appeal, that would not affect the Phillips schools' Error 1 claims. Recall that those claims allege that the Secretary put student accounts in the wrong cohort default period because he relied on tape dump data that miscalculated the accounts' date entering repayment. Later on, we reject the only argument that the Secretary raises, i.e., an alleged reversal of the statutory burden of proof, that would affect the district court's determination on the Error 1 claims. See infra Part III
 
 
 [9]
 Indeed, the Secretary asserts that we would have to uphold as reasonable an interpretation of "calculation" as including only appeals based on purely mathematical errors
 
 
 [10]
 There is a second reason militating against deference to the interpretation proffered by the Secretary here. Although for purposes of our statutory analysis we accept the government's attribution of this interpretation to the "Secretary," there is in fact scant evidence that the Secretary or responsible policymakers at DOE--rather than the attorneys who have litigated this case--subscribe to this reading of the statutory language. As best we can tell, this interpretation was not articulated by the agency in any of its decision letters. Nor was such an interpretation raised by DOE's lawyers before the district court in the Atlanta litigation (a fact which by itself would normally preclude our addressing that argument in the Atlanta portion of this appeal, see District of Columbia v. Air Florida, Inc., 750 F.2d 1077, 1084-85 (D.C.Cir.1984)). Finally, there is evidence that at least some agency policymakers take a different view of this issue. See infra note 11
 The familiar rule is that we do not defer to an interpretative position that is not articulated by the agency itself. See, e.g., Investment Co. Institute v. Camp, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097-98, 28 L.Ed.2d 367 (1971). We have recognized that this rule might be inapplicable when there is no risk that counsel may have acted as "mavericks, disembodied from the agency that they represent," Church of Scientology v. IRS, 792 F.2d 153, 165 (D.C.Cir.1986) (en banc ) (Silberman, J., concurring), aff'd, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), and when there is no danger that the position was adopted in haste without an opportunity for presentation of alternative views. See FLRA v. Department of the Treasury, Financial Management Service, 884 F.2d 1446, 1455-56 (D.C.Cir.1989), cert. denied, 493 U.S. 1055, 110 S.Ct. 863-64, 107 L.Ed.2d 947-48 (1990). Because of the facts noted above, however, we cannot confidently exclude those risks in this case. Thus, the requirements for invoking such an exception have not been met.
 
 
 [11]
 In fact, DOE's own Director of Student Assistance Programs seems to have reached a similar conclusion:
 Q. So your view is that improper servicing or collecting was not a basis for appeal?
 A. Improper servicing or collecting can yield incorrect data. And the incorrect data is definitely a basis for appeal.
 Deposition of William Moran, CBM Education Center v. Texas Guaranteed Student Loan Corp., No. 92-2012-M (Bankr.S.D.Tex.) (quoted in Brief for Amicus Curiae Career College Association at 6).
 
 
 [12]
 The legislative history of the relevant provisions provides no sure answer to the precise question raised by this case. See Independent Community Bankers Ass'n v. Board of Governors of the Federal Reserve System, 820 F.2d 428, 434 (D.C.Cir.1987) (clear meaning of a statute can be overridden only by a clearly contrary legislative intent), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). There is, however, a great deal of evidence that Congress was aware that lenders had often been remiss in fulfilling their servicing obligations. See, e.g., Abuses in Federal Student Aid Programs: Hearings Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, 101st Cong., 2d Sess., Part 3 at 165, 170 (Sept. 25-26, 1990) ("Abuses Hearings") (staff statement) ("Despite the possible loss of the federal guarantee, there is evidence suggesting that many lenders fail to comply with due diligence requirements."); id. at 283, 302-07 (statement of Garry D. Hays, President of Higher Education Assistance Foundation (guaranty agency)) (describing systematic servicing deficiencies by a lender). In fact, Congress added the relevant part of § 1085(m) as a "technical amendment" to the Student Right-to-know and Campus Security Act because DOE sought explicit authority to recalculate CDRs that were too low because of lenders' errors. See Abuses Hearings, Part 4, at 141, 245 (Letter from Ted Sanders, Deputy Secretary of Education, to Senator Sam Nunn). Thus, the disputed language resulted from DOE's own recognition that, despite its "front end" mechanisms, the calculation of CDRs may be rendered inaccurate by improper servicing
 The Secretary points to the fact that Senator Kennedy, in introducing the amendment to § 1085(m), said that the provision "allows" the Secretary to exclude improperly serviced loans, see 136 CONG.REC. S13129 (daily ed. Sept. 13, 1990), as evidence that this authority is discretionary. This interpretation, aside from being based on a single, ambiguous statement of a lone legislator, conflicts with the ordinary meaning of the requirement that the Secretary "shall" exclude such loans. See, e.g., Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935) ("shall" is the "language of command").
 
 
 [13]
 There is one caveat to this broad statement. We do find, see infra Part III, that the Secretary may not administer the appeals process in a way that requires schools to proffer information that they cannot obtain in order to maintain a successful appeal, whether that appeal is based on improper servicing or not
 
 
 [14]
 Since the Secretary does not allege that the schools in fact could have obtained the relevant information through more diligent efforts, we need not decide what amount of effort a school must exert to obtain the necessary information in order to shift the burden of production. We do note, however, that given the Secretary's broad discretion in structuring the appeals process, we would be bound to defer to any reasonable standard that he devised
 We also do not decide whether there may be situations where the Secretary could deny the schools access to data in order to further another policy.
 
 
 [15]
 The Secretary also alleges that the district court improperly shifted the burden of proof on a different issue. In a footnote, the district court noted that the Secretary had moved students who the Secretary admitted were improperly placed in the 1988 CDR period into the 1987 CDR period and stated that it was unclear whether the Secretary could shift loans in that manner or whether he had to exclude those loans entirely. See 792 F.Supp. at 118 n. 10. The court found that it was impossible to tell whether the Secretary had the authority to shift the loans because the Secretary's conclusory findings did not explain why the errors were acknowledged in the first place--if the Secretary acknowledged a mere accounting error then the defaulted loan could likely be shifted to a new period, but if the error involved "servicing," the statute would seem to require outright "exclusion" from all CDR calculations. See id. (citing 20 U.S.C. § 1085(m)). We agree with the district court that, absent some explanation for the Secretary's original decision to accept the errors, a court cannot determine whether the Secretary's shifting of errors to another cohort default period is permissible